IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| **CONTINENTAL RESOURCES, INC.**, <br><br>   Plaintiff, <br><br> v. <br><br> **EMPLOYERS MUTUAL CASUALTY COMPANY**, <br><br>   Defendant. | Case No._____ <br><br> **Jury Trial Demanded** |

## COMPLAINT

Plaintiff, Continental Resources, Inc. ("Continental") for its Complaint against Defendant, Employers Mutual Casualty Company ("EMC"), alleges and states as follows:

### INTRODUCTION

1. This Complaint for breach of contract and bad faith arises from EMC's refusal to abide by its contractual obligations to provide insurance coverage to Continental, as an additional insured, for damages Continental suffered as a result of EMC's primary insured's negligent conduct.

2. Not only has EMC refused coverage to Continental, it has also acted unreasonably in handling Continental's claim by failing to conduct a good-faith investigation into the occurrence giving rise to the claim. EMC demanded Continental provide excessive documentation, including documents which Continental had to create, and then denied coverage based on alleged "evidence" even before Continental delivered the documentation.

3.     Continental seeks judgment against EMC for breach of contract and breach of EMC's duty of good faith and fair dealing.

## PARTIES

4.     Continental is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma.

5.     EMC is an Iowa corporation with its principal place of business in Des Moines, Iowa.

## JURISDICTION AND VENUE

6.     The jurisdiction of this Court is based upon 28 U.S.C. § 1332. There exists complete diversity among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

7.     Venue is proper in the District of North Dakota pursuant to 28 U.S.C. § 1391 because the claims asserted herein arise out of acts or omissions that occurred in this judicial district.

## FACTUAL BACKGROUND

**A.     The Indemnity and Insurance Agreements**

8.     Continental entered into a Master Service Contract (the "MSC") with C&D Oilfield Services, Inc. ("C&D") on July 20, 2004.

9.     Paragraph 3.1 of the MSC requires C&D to procure and maintain, at its sole expense, policies of insurance in favor of Continental. The MSC defines the required minimum levels of coverage and requires Continental be named an additional insured on the policies

10. In compliance with Paragraph 3.1 of the MSC, C&D acquired Policy #3D52156, issued by EMC, with an effective date of February 2, 2011 to February 2, 2012 (the "Policy"). The Policy has limits of $1,000,000 per occurrence subject to a $2,000,000 general aggregate limit. The Policy names Continental as a named insured.

11. Paragraph 4.2 of the MSC requires C&D to:

indemnify [Continental ] from and against any and all claims, demands, judgments, defense costs, or suites (including, but not limited to, claims, demands, judgments or suits for property damage, bodily injury, illness, disease, death or for loss of services wages or for loss of consortium or society) which may be brought by any person or entity against [Continental ] or in which [Continental ] may be named as a party defendant, in any way, directly or indirectly arising out of or related to the performance of [the MSC], including [Continental 's] own negligence, or the use by [C&D] or its employees of, or their presence on, any premises owned, operated or controlled by [Continental ].

B.  The Incident resulting in an Occurrence

12. Pursuant to the MSC, on or about January 27, 2012, Continental contacted C&D to perform flow-testing services at a wellsite owned and operated by Continental known as the Jack 2-9H Killdeer, Dunn County, North Dakota ("Well" or "Wellsite").

13. During flow testing, fluids were sent to the separator due to the negligence of C&D. The fluids high-leveled in the separator, sending excess crude oil and brine water to the flare stack instead of the holding tanks where the fluids are normally stored. The oil and brine water were forced out of the flare stack by natural gas, creating a mist. The crude oil in the mist was ignited by the flare, causing a fire which impacted both the location of the Well and the surrounding property outside the location. The West Dunn Fire Department responded to the fire in the early morning hours of January 28, 2012, and extinguished the fire.

14. At the time of the incident, and during subsequent repairs to a fire-damaged fence, Continental was not aware of any petroleum or brine water contamination to the surface property. Continental believed fluids which escaped during the Incident had been consumed by the fire.

15. In early April 2012, the NDIC performed a routine inspection at the Wellsite. During the inspection, dead vegetation was discovered around the Wellsite. The NDIC contacted Continental to inform it of the findings, and demanded Continental commence clean-up activities and submit a spill report documenting the clean-up and remediation efforts.

16. In compliance with the NDIC's demand, Continental engaged contractors to conduct an initial sampling of the Impacted Area and provide information about the extent of the contamination. Continental also engaged contractors to remediate the Impacted Area, dispose of contaminated material, and conduct post-clean up sampling to confirm the adequacy of the clean-up activities. As part of the remediation, Continental excavated approximately 49,000 square feet of contaminated soil.

17. Continental spent a total of $386,373.51 on the remediation of the Wellsite as a result of the Incident. The total amount charged to Continental by the West Dunn Fire Department for its response to, and extinguishment of, the fire was $7,056.00. The total amount charged to Continental by JD Fencing for the rebuilding of a fence damaged by the fire was $1,701.00. The total amount charged to Continental by Absorbent & Safety Solutions for Incident related remediation was $377,616.51.

18. The Incident constitutes an "Occurrence" under the Policy. Accordingly, the Policy has been triggered and should cover Continental's claims. Continental made demand on both C&D and EMC for indemnity and reimbursement of costs, but both refused.[1]

C. **EMC's Wrongful Denial of Coverage and Bad Faith Conduct**

19. Continental, as named insured on the Policy, is entitled to coverage for all costs it incurred as a result of the Incident. Continental has complied, shall be deemed to have complied, or has been relieved from complying with the terms and conditions of the Policy. At all times after providing notice of the Incident, Continental expected EMC to comply with its insuring obligations.

20. On February 5, 2013, Continental made demand on EMC for indemnification and coverage under the Policy for property damage resulting from the Incident.

21. On February 26, 2013, EMC responded by demanding Continental provide further documentation, including demands for Continental to draft and/or create documents relating to its clean-up and remediation efforts. In addition, EMC demanded Continental provide "all reports" relating to separate incidents that may have occurred at the Wellsite or at nearby well sites.

---

[1] As a result of C&D's refusal to comply with its contractual obligations, CONTINENTAL filed a lawsuit against C&D in the United States District Court for the District of North Dakota, styled *Continental Resources, Inc. v. C&D Oilfield Services, Inc.*, Case No. 1:13-CV-154. The case is set for trial on February 13, 2017.

22. Despite the excessive and unreasonable nature of EMC's demands, Continental gathered the requested documentation and even drafted additional documents to aid EMC in its investigation of the claim. However, on April 2, 2013, before Continental had the opportunity to deliver the documents, EMC issued a letter to Continental denying coverage. EMC admitted, "the actions of our insured's employees caused an increase in the flare on the Jack 2-9H well near Killdeer, ND. Because of the windy conditions on that day, approximately 30 acres were burned." EMC offered "to provide payment for the cost of the fire department expenses . . . and the rebuilding of the fence that was damaged by the fire . . . ." Notwithstanding the fact it had not yet received the requested documentation from Continental, EMC then stated: "There is no evidence to show that the additional remediation that was performed at the site is related to the January 28, 2012 fire."

23. Continental responded to EMC by letter dated April 8, 2013, declining EMC's offer to pay for only the fire damage. Continental provided additional documentation, including photos, spill reports, spill response reports, and daily work reports, and again demanded EMC pay the full amount Continental incurred because of the Incident.

24. Continental next received a letter on May 20, 2013, from ECC Horizon, a claims investigator contracted by EMC to further (or possibly for the first time) investigate Continental's claim. ECC demanded even more documentation from Continental, much of which was irrelevant to the subject matter of the investigation, including technical or letter reports, correspondence from regulatory agencies, all

written communications relating to the Incident, a list of all contractors who performed service on the Well from September 2011 to May 2012, a "scaled and oriented" site plan depicting all equipment and sample locations, names and departments of regulatory officials who directed or oversaw the remediation, and the chemical composition of the contaminants that were remediated. In addition, ECC demanded Continental respond to numerous written questions, most of which were aimed at *disproving* Continental's claim that the damage was a result of the Incident. Indeed, it was obvious ECC was hired by EMC to manufacture a reason to deny the claim.

25. In an effort to cooperate with EMC's investigation, Continental responded to ECC's requests for additional documentation and written questions on September 20, 2013.

26. EMC responded by letter dated October 1, 2013, accusing Continental of not sufficiently responding to ECC's requests for documentation. EMC again denied Continental's claim, stating "[b]ased on the documentation provided by Continental Resources, and the information obtained in our investigation, we do not feel there is sufficient documentation to support that the remediation that was done at the Jack 2-9H site is related to the activities of C&D Oilfield Services, Inc."

27. On October 8, 2013, Continental replied to EMC, pointing out that it did, in fact, provide all available documentation to EMC and ECC.

28. On December 4, 2013, EMC replied to Continental's October 8 letter, this time through legal counsel. Despite having previously stated its intention to deny coverage, EMC's December 4 letter indicated the investigation was ongoing. Further,

the letter made clear that neither EMC nor any representative or contractor of EMC, including ECC, had even visited the Well-site to conduct an inspection in the ten months since Continental gave EMC notice of the claim. EMC demanded a site inspection take place within 30 days of December 4.

29. In a continued effort to cooperate with EMC's investigation, Continental quickly arranged for a site inspection and notified EMC's counsel by letter dated December 9, 2013, that Continental representatives would be available to meet at the Wellsite on December 12, 2013.

30. Notwithstanding EMC's demand for a site inspection within 30 days, Continental never received a response confirming the inspection date. When Continental called EMC's counsel on December 11 to confirm the inspection date, it was informed EMC's counsel was in trial and that neither EMC nor ECC had any knowledge of a potential inspection of the Wellsite.

31. EMC has never provided Continental a written explanation as to why Continental's remediation costs are not covered under the Policy. Nor has EMC explained what "evidence" EMC relied upon in determining Continental 's remediation efforts were not related to the Incident. EMC did not conduct a reasonable, good-faith inspection of the Incident. Rather, EMC specifically requested documentation, and looked for evidence, to support its denial of coverage. EMC's actions constitute a breach of the Policy and are in derogation of the duty of good faith and fair dealing it owes to its insured, Continental.

**CLAIMS FOR RELIEF**

I. **Breach of Contract**

Continental adopts the allegations contained in Paragraphs 1 through 31, and further states:

32. EMC, as issuer of the Policy, is obligated to pay all costs incurred by Continental, a named insured, as a result of an Occurrence.

33. EMC has acknowledged the high-level event and subsequent fire constitute an "Occurrence" under the policy.

34. Notwithstanding EMC's admission that the Incident is an "Occurrence," EMC denied coverage to Continental for costs Continental incurred in remediation of the damage caused by the Incident.

35. EMC's denial of coverage constitutes a breach of the Policy, to which Continental is a named insured.

36. As a result of EMC's breach, Continental has been damaged in the amount of at least $386,373.51, plus attorney fees and costs incurred in litigation with C&D.

II. **Breach of the Duty of Good Faith and Fair Dealing**

Continental adopts the allegations contained in Paragraphs 1 through 36, and further states:

37. As a named insured on the Policy, EMC owes Continental a duty to act fairly and in good faith in dealing with Continental, including a duty of fair dealing in investigating and paying claims.

38.     EMC breached its duty of good faith and fair dealing owed to Continental by, among other things, (1) failing to conduct a reasonable, good-faith investigation; (2) making unreasonable requests of Continental; (3) unreasonably delaying its investigation; (4) determining no coverage exists before investigating; and (5) conducting an investigation for the purpose of denying coverage. In short, EMC acted in an effort to deny Continental the contractual rights it enjoys under the Policy.

39.     EMC's conduct is in violation of the duty of good faith and fair dealing it owes to Continental. EMC's actions were done without just cause and were motivated by its desire to increase profits by reducing or avoiding the payment of valid claims. Continental is informed and believes EMC's wrongful actions, described above, are performed with frequency and as a general business practice of EMC.

40.     Continental has suffered substantial damages due to EMC's failure to act in good faith and deal fairly with Continental.

## JURY DEMAND

Continental hereby demands a trial by jury on all issues for which a trial by jury is permitted.

## PRAYER FOR RELIEF

WHEREFORE, Continental prays it have and recover judgment against EMC awarding Continental:

A.  Monetary damages in the amount proven at trial, including punitive damages;

B.  Interest on all amounts due and owing by EMC;

{S378217;4}                                     10

C.      All costs and attorney fees it incurs in this action; and

D.      Any other and further relief (legal or equitable) as is just and proper under the circumstances of this case.

*[signature]*

Nicholas V. Merkley
Oklahoma Bar No. 20284
GABLEGOTWALS
One Leadership Square, 15th Floor
211 North Robinson
Oklahoma City, OK 73102-7255
Telephone: (405) 235-5500
Facsimile: (405) 235-2875
E-Mail:  nmerkley@gablelaw.com

Ryan A. Pittman
Oklahoma Bar No. 31187
   North Dakota ID No. 07788
1100 ONEOK Plaza
100 West 5th Street, Suite 1100
Tulsa, Oklahoma 74103-4217
Telephone (918) 595-4872
Facsimile (918) 595-4990
rpittman@gablelaw.com

*Attorneys for Continental Resources, Inc.*